**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

                         Plaintiff,

                v.

RICHARD USHER,
ROHAN RAMCHANDANI, AND
CHRISTOPHER ASHTON

                    Defendants.

:    Case No. 1:17-Cr-00019

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' OPPOSITION TO THE GOVERNMENT'S MOTIONS IN LIMINE**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

OPPOSITION TO FIRST MOTION TO ADMIT LAY OPINION TESTIMONY ........................1

OPPOSITION TO SECOND MOTION TO EXCLUDE EVIDENCE AND
ARGUMENT THE GOVERNMENT WRONGLY CONTENDS IS IRRELEVANT ................2

    A.    Defendants Are Entitled to Introduce Evidence of Professional Norms ................5

        1.    Evidence of Professional Norms Is Relevant to Prove the
            Absence of an Illegal Agreement ................................................. 6

        2.    Professional Norms Evidence Is Relevant to Prove Lack of
            Intent ................................................................................. 7

    B.    Defendants Are Entitled to Introduce Evidence of Chat Rooms'
       Legitimate Purposes ................................................................9

    C.    Defendants Are Entitled to Introduce Evidence of the Effect of Their
       Conduct to Negate the Existence of a Price-Fixing Conspiracy and
       Intended and Substantial Effects in the United States. ..........................11

    D.    Defendants Are Entitled to Introduce Evidence of Their Vertical
       Relationship to Show the Absence of a *Per Se* Restraint of Trade ................12

    E.    The Probative Value of the Evidence Is Not Substantially Outweighed
       by Danger of Misleading the Jury or Wasting Time ..............................13

OPPOSITION TO THIRD MOTION TO EXCLUDE EXPERT TESTIMONY OF
PROFESSOR EDWARD SNYDER ................................................................14

    A.    Professor Snyder is Eminently Qualified to Opine on the Proposed
       Subjects of His Testimony ........................................................16

    B.    Professor Snyder Based His Opinions on Widely Accepted, Reliable
       Methodologies ....................................................................18

    C.    Professor Snyder's Testimony Will Not Usurp the Roles of the Court
       or Jury ............................................................................20

    D.    Professor Snyder's Testimony Will Not Mislead the Jury ........................21

OPPOSITION TO FOURTH MOTION TO EXCLUDE THE MARCH 15, 2016 SFO
LETTERS ................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Tobacco Co. v. United States,*
328 U.S. 781 (1946) ........................................................................................4, 7, 11

*Anderson News, L.L.C. v. Am. Media, Inc.,*
680 F.3d 162 (2d Cir. 2012) ...................................................................................11

*Beech Aircraft Corp. v. Rainey,*
488 U.S. 153 (1988) ................................................................................................25

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................................................3, 7

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
441 U.S. 1 (1979) ....................................................................................................11

*Cement Mfrs. Protective Ass'n v. United States,*
268 U.S. 588 (1925) ............................................................................................3, 10

*Cont'l Baking Co. v. United States,*
281 F.2d 137 (6th Cir. 1960) ............................................................................11, 15

*Fleischman v. Albany Med. Ctr.,*
728 F. Supp. 2d 130 (N.D.N.Y. 2010) ...................................................................16

*Galardo v. AMP Inc.,*
1982 WL 1791 (N.D. Cal. Jan. 8, 1982) ................................................................12

*Gatt Commcn's, Inc. v. PMC Assocs., LLC,*
No. 10 Cv. 8, 2011 U.S. Dist. LEXIS 29072 (S.D.N.Y. Mar. 10, 2011) ...............13

*Hartford Fire Ins. Co. v. California,*
509 U.S. 764 (1993) ........................................................................................ passim

*Hygh v. Jacobs,*
961 F.2d 359 (2d Cir. 1992) ...................................................................................21

*In re High Fructose Corn Syrup Antitrust Litig.,*
295 F.3d 651 (7th Cir. 2002) (Posner, J.) .......................................................14, 19

*In re LIBOR,*
299 F. Supp. 3d 430 (S.D.N.Y. 2018) ....................................................................18

*In re Polypropylene Carpet Antitrust Litig.*,
    93 F. Supp. 2d 1348 (N.D. Ga. 2000) ...................................................................16

*In re Sulfuric Acid*,
    743 F. Supp. 2d 827 (N.D. Ill. 2010) ....................................................................12

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    Doc. No. 7312, 3:07-md-01827-SI, Individual Case No. 3:10-cv-1064-SI
    (N.D. Cal.)..............................................................................................................17

*In re Titanium Dioxide Antitrust Litig.*,
    No. RDB-10-0318, 2013 U.S. Dist. LEXIS 62394 (D. Md. May 1, 2013) ......................18, 20

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991)...................................................................................25

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
    551 U.S. 877 (2007).........................................................................................4, 13

*Link v. Mercedes-Benz of North America, Inc.*,
    788 F.2d 918 (3d Cir. 1986)......................................................................................5

*Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*,
    97 F. Supp. 3d 485 (S.D.N.Y. 2015)......................................................................18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).....................................................................................3, 7, 11

*Monsanto Co. v. Spray-Rite Service Corp.*,
    465 U.S. 752 (1984).....................................................................................3, 7, 10

*Nitro Distrib., Inc. v. Alticor, Inc.*,
    565 F.3d 417 (8th Cir. 2009) .................................................................................12

*Ramirez v. Berkel, Inc.*,
    No. 02-cv-6887 (JSR)(KNF), 2005 U.S. Dist. LEXIS 14324
    (S.D.N.Y. July 14, 2005) ......................................................................................18

*SEC v. Goldstone*,
    No. 12-cv-257, 2016 WL 3854689 (D.N.M. June 3, 2016)....................................23

*SEC v. Tourre*,
    950 F. Supp. 2d 666 (S.D.N.Y. 2013)....................................................................19

*SEC v. U.S. Envtl., Inc.*,
    No. 95 Civ. 6608 (PKL)(AJP), 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002)........................6

*Sitkin Smelting & Ref. Co. v. FMC Corp.*,
   575 F.2d 440 (3d Cir. 1978) .................................................................................. 10

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*,
   346 U.S. 537 (1954) ........................................................................................... 3, 7

*U.S. Info. Sys. v. IBEW Local Union No. 3*,
   313 F. Supp. 2d 213 (S.D.N.Y. 2004), *aff'd*, No. 00-cv-4736 (S.D.N.Y. Apr.
   6, 2004) (Berman, J.) ............................................................................... 15, 18, 20

*United States v. Apple, Inc.*,
   952 F. Supp. 2d 638 (S.D.N.Y. 2013) .................................................................. 6, 8

*United States v. Awad*,
   2007 WL 1988382 (S.D.N.Y. 2007) ........................................................................ 25

*United States v. Biaggi*,
   909 F.2d 662 (2d Cir. 1990) ................................................................................... 22

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ................................................................................. 21

*United States v. Blum*,
   62 F.3d 63 (2d Cir. 1995) ......................................................................................... 9

*United States v. Brandt*,
   196 F.2d 653 (2d Cir. 1952) .................................................................................. 5, 9

*United States v. Certified Envtl. Servs., Inc.*,
   753 F.3d 72 (2014) .................................................................................................. 24

*United States v. Citizens & S. Nat'l Bank*,
   422 U.S. 86 (1975) .............................................................................................. 3, 10

*United States v. Connolly*,
   No. 16-cr-370, 2018 U.S. Dist. LEXIS 84167 (S.D.N.Y. May 15, 2018) .............. 22

*United States v. Daly*,
   842 F.2d 1380 (2d Cir. 1988) ................................................................................... 6

*United States v. Gaspard*,
   744 F.2d 438 (5th Cir. 1984) .................................................................................. 10

*United States v. Godfrey*,
   787 F.3d 72 (1st Cir. 2015) ..................................................................................... 25

*United States v. Grinage,*
   390 F.3d 746 (2d Cir. 2004)............................................................................1, 2

*United States v. Grose,*
   461 F. App'x 786 (10th Cir. 2012) ......................................................................10

*United States v. Joseph,*
   542 F.3d 13 (2d Cir. 2008).................................................................................8-9

*United States v. Kaplan,*
   490 F.3d 110 (2d Cir. 2007)...................................................................................2

*United States v. Koppers Co.,*
   652 F.2d 290 (2d Cir. 1981)...............................................................................3, 8

*United States v. Litvak,*
   808 F.3d 160 (2d Cir. 2015).................................................................3, 5, 10, 21

*United States v. Onumonu,*
   967 F.2d 782 (2d Cir. 1992)...................................................................................6

*United States v. Rajaratnam,*
   No. 13-Cr-00211, slip op. (S.D.N.Y June 6, 2014) ............................................22

*United States v. Rea,*
   958 F.2d 1206 (2d Cir. 1992).................................................................................2

*United States v. Reed,*
   639 F.2d 896 (2d Cir. 1981).................................................................................25

*United States v. Shapiro,*
   15-cr-155 (D. Conn.)..............................................................................................5

*United States v. Simson,*
   940 F.2d 654 (4th Cir. 1991) .................................................................................5

*United States v. Stewart,*
   No. 03-Cr.717 (MGC) 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) .....................9

*United States v. U.S. Gypsum Co.,*
   438 U.S. 422 (1978)....................................................................................3, 8, 24

*United States v. White,*
   No. 02-Cr.1111 (KTD), 2003 WL 721567 (S.D.N.Y. Feb. 28, 2003)...................9

*United States v. Yannotti*,
  541 F.3d 112 (2d Cir. 2008)..........................................................................2

## STATUTES AND RULES

Fed. R. of Evid. 201(b)(2)...............................................................................25

Fed. R. of Evid. 403.......................................................................................13

Fed. R. of Evid.701........................................................................................1, 2

Fed. R. of Evid. 704.......................................................................................21

Fed. R. of Evid. 803(8) ..................................................................................25

Sherman Antitrust Act, 15 U.S.C. § 1 ..................................................... passim

## MISCELLANEOUS

*Scott v. Gov't of the United States of America*,
  [2018] EWHC 2021 ....................................................................................23

Jury Instructions (Nov. 6, 2017) (Doc. 235),
  *United States v. Tokai Kogyo Co.*,
  16-cr-63 (TSB) (S.D. Ohio) ..........................................................................7

## INTRODUCTION

The Government, ignoring Supreme Court precedent, uses its motions *in limine* to try to stop Defendants from introducing evidence probative of the core elements of the offense.  The Court should reject this attempt to stack the deck against Defendants, and deny the motions.

## OPPOSITION TO FIRST MOTION TO ADMIT LAY OPINION TESTIMONY

The parties have opposing views on how to interpret the evidence at the heart of this case.  To tell its story about what this evidence means, the Government intends to call its cooperating witness (Witness A) to provide his opinion about what others' statements mean.  Federal Rule of Evidence 701 allows a witness to offer lay opinion when the proponent shows the testimony (1) is rationally based on the witness's perception and (2) helpful to determining a fact in issue.[1]

Bypassing these requirements, the Government prematurely seeks an advisory opinion permitting Witness A to opine on the meaning of:  (1) Witness A's "own statements"; (2) Defendants' statements to Witness A; (3) Defendants' statements to each other "when Witness A himself was not present"; and (4) "statements made by Defendants and other traders"—in conversations that did not involve Witness A—"when those other conversations are relevant to the charged crime."  Gov't Mem. in Supp. of Mots. in Limine at 2-3 (Doc. 116) (hereinafter "Mem.").  Because the Government neither identifies the testimony it seeks to introduce nor satisfies Rule 701, the Court should deny the motion as premature and defer ruling on any specific lay opinion testimony until trial.

Pre-approving the Government's proposed lay opinion testimony would be especially problematic here because it appears the Government wishes to elicit Witness A's testimony about Defendants' intent in making certain statements, including statements they made to people

---

[1] *United States v. Grinage*, 390 F.3d 746, 749 (2d Cir. 2004).

other than Witness A.[2]  Such testimony would not likely be rationally based on Witness A's own

perception, would risk usurping the role of the jury and telling it what to infer from the evidence,

and thus would violate Rule 701.[3]  The jury should evaluate the significance of Defendants'

statements, not the Government's immunized witness.

## OPPOSITION TO SECOND MOTION TO EXCLUDE EVIDENCE AND ARGUMENT THE GOVERNMENT WRONGLY CONTENDS IS IRRELEVANT

Attempting to deprive Defendants of the opportunity to prove they never made a naked,

horizontal agreement to fix prices, the Government moves to exclude the most probative

evidence of Defendants' lack of agreement and lack of intent, and mischaracterizes the purposes

for which Defendants would offer the evidence.[4]  Contrary to the Government's assertions,

Defendants do not seek to offer evidence to "excuse" *per se* illegal conduct.  Mem. at 5-6, 8, 10.

Rather, Defendants seek to offer this evidence to contest the elements of the *per se* offense the

Government claims to have charged:  (1) a naked, horizontal agreement (2) in which Defendants

---

[2]  For example, based on its exhibit list, it appears the Government intends to elicit Witness A's lay opinions about recorded conversations between Defendants and other traders about policy changes at Barclays and JPMC.  Defendants have separately moved to exclude that evidence. Defs.' Mem. in Supp. of Mots. in Limine, at 11-16 (Doc. 118) (hereinafter "Defs.' MIL Mem."). Because Witness A was not involved in these compliance issues (he had left Barclays over a year before those calls were made, and never worked for JP Morgan), he has no purported "insider" knowledge, Mem. at 1, concerning those communications to support any lay opinion testimony.

[3]  *See United States v. Rea*, 958 F.2d 1206, 1216 (2d Cir. 1992) ("When the issue is a party's knowledge . . . we suspect that in most instances a proffered lay opinion will not meet the requirements of Rule 701."); *Grinage*, 390 F.3d at 750-51 (vacating conviction because lay opinion went "beyond interpreting code words" into "summarizing . . . beliefs about the defendant's conduct"); *United States v. Kaplan*, 490 F.3d 110, 118-19 (2d Cir. 2007) (vacating conviction because lay opinion regarding the intent of the defendant was inadmissible).

The Government relies on *United States v. Yannotti*.  Mem. at 2-4.  But there the district court admitted only *two* recorded calls over objection *during* trial after concluding the Government had laid a proper foundation.  541 F.3d 112, 117-18 (2d Cir. 2008).

[4]  The Government similarly mischaracterizes Defendants' proposed jury instructions.  Mem. at 5 n.2.  Defendants' instructions ask the jury only to hold the Government to its burden:  to prove whether the charged, *per se* "restraint" ever existed.

participated with criminal intent (3) that had an intended and actual substantial effect on U.S. commerce.  Binding Supreme Court and Second Circuit precedent, which the Government's motion ignores, explains why every category of evidence the Government seeks to exclude is directly relevant to defending against the charge:

- Because merely parallel conduct is not a Sherman Act agreement,[5] and a criminal antitrust case requires proof of an intent to fix prices,[6] Defendants are entitled to offer evidence that their behavior was consistent with well-established professional norms in the FX industry to support an inference of parallel conduct rather than an illegal agreement, and to negate the allegation that they intended to fix prices.

- Because information exchanges are not *per se* illegal,[7] and can be necessary among vertically oriented parties,[8] Defendants are also entitled to offer evidence of the legitimate purposes of their chat room (*e.g.*, to share market color and to transact), and that their supervisors encouraged them to use chat rooms for these purposes,[9] to rebut the

---

[5]  *E.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561 n.7 (2007) ("[N]either parallel conduct nor conscious parallelism, taken alone, raise the necessary implication of [antitrust] conspiracy[.]"); *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540-41 (1954) ("[T]his Court has never held that proof of parallel business behavior . . . itself constitutes a Sherman Act offense."); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) ("Respondents . . . must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action[.]").

[6]  *E.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 435, 443 (1978) ("[A]n effect on prices, without more, will not support a criminal conviction under the Sherman Act. . . .  Rather, we hold that a defendant's state of mind or intent is an element of a criminal antitrust offense which must be established by evidence and inferences drawn therefrom and cannot be taken from the trier of fact through reliance on a legal presumption of wrongful intent from proof of an effect on prices.") ("[I]ntent is a necessary element of a criminal antitrust violation[.]"); *United States v. Koppers Co.*, 652 F.2d 290, 295 (2d Cir. 1981) ("[T]he jury was properly instructed that . . . it must find an intent to rig prices.").

[7]  *E.g.*, *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113-14 (1975) ("[Exchanging] price information is not itself a *per se* violation of the Sherman Act."); *Cement Mfrs. Protective Ass'n v. United States*, 268 U.S. 588, 604 (1925) ("[W]e cannot regard the . . . dissemination of information which tends to prevent the procuring of fraudulent contracts . . . as an unlawful restraint of trade[.]").

[8]  *E.g.*, *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 763 (1984) ("[T]o assure an efficient distribution system, manufacturers and distributors constantly must coordinate their activities[.]").

[9]  *See United States v. Litvak*, 808 F.3d 160, 189-190 (2d Cir. 2015).

Government's contention that Defendants concealed their conduct or that the conduct could have served no purpose other than to fix prices.

- Because the Sherman Act reaches foreign conduct (here, London traders) only where it was "*meant* to produce and did in fact produce some *substantial effect* in the United States,"[10] Defendants are entitled to offer evidence that they used their chat room for efficiency-enhancing transactions to show that they did not intend to and actually did not adversely affect U.S. commerce, as well as to negate the inference that any price-fixing agreement existed in the first place.[11]

- Because vertical restraints are not *per se* illegal,[12] Defendants are entitled to offer evidence that they were not horizontal competitors in the interbank market, but instead were vertically aligned actual or potential counterparties, to contest the Government's proof of a *per se* offense, which applies only to horizontal competitors.

This evidence is also critical to impeach Witness A, the Government's sole percipient witness.  Witness A has stated in interviews with the Government that Defendants' conduct followed professional norms in the FX industry, that the chat room had legitimate purposes, and that Defendants' conduct lacked a price-fixing purpose.[13]  Because there was no express

---

[10]  *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993) (emphases added).

[11]  *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 804 (1946) (evidence of "price changes is circumstantial evidence of the existence of a [price-fixing] conspiracy").

[12]  *E.g.*, *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007) ("Vertical price restraints are to be judged according to the rule of reason.").

[13]  *E.g.*, Dec. 18, 2013, FBI Interview Mem. of Witness A at 32:

> It was assumed that everyone was talking to the market about fixings and matching.  If traders communicate with the purpose to match only to find they are the same direction, they come upon this information as a matter of happenstance. . . .  [B]eing in a situation where one discovers they have similar fix exposure happens to every trader.  [Witness A's] managers were aware of these practices both because they were widespread and because the managers themselves were traders.  Everyone involved in the market understood that that was how things were done.

*E.g.*, Dec. 5, 2013, FBI Interview Mem. of Witness A at 14:

> When [a trader] . . . provided . . . [an]other trader with an open risk position, the one did so to solicit help from the other.  If the two traders had opposite exposure to the market they could offload their risk positions without having to go to the market and affect price.  The person receiving open risk exposure information benefited because he could offer his customers a better execution rate if he did not

agreement to fix prices, and instead Witness A merely "***believe[d]***" an agreement existed "[b]ecause of . . . ***how we acted*** in the period of this chat," the parties will argue competing inferences based on the same evidence.[14]  Granting the Government's motion would permit the Government to argue its interpretation in an evidentiary vacuum.  Defendants contest each element of the offense and have the right under Supreme Court precedent to present evidence supporting their defense.[15]  For these and the following reasons, the Court should deny the Government's motion.

### A.    Defendants Are Entitled to Introduce Evidence of Professional Norms

Courts often admit evidence of industry professional norms to negate an element of the offense.  For instance, the Third Circuit in *Link v. Mercedes-Benz of North America, Inc.* affirmed the admission of such evidence in an antitrust case:

> An essential element of the appellants' case required that they prove that Mercedes conspired with its dealers or engaged in concerted action when the dealers used the Mercedes time guides or followed the operations instructions. The various manufacturers' documents at issue here tended to render appellants' allegations less probable, because a reasonable inference was that use of the time guides occurred due to independent action motivated by competitive forces and *industry practice*.[16]

---

need to go into the market to transact.

[14]  Kendall Decl., Ex. A at 47:23-48:2 (emphases added) (Witness A Grand Jury Tr. (May 5, 2016)).

[15]  *See Litvak*, 808 F.3d at 190 (vacating conviction where district court improperly excluded evidence probative of intent and materiality).

[16]  788 F.2d 918, 927 (3d Cir. 1986) (emphasis added); *see also Litvak*, 808 F.3d at 190; *United States v. Simson*, 940 F.2d 654 (4th Cir. 1991) ("evidence of custom and practice in the surety bond industry would have negated criminal intent"); *United States v. Brandt*, 196 F.2d 653, 657 (2d Cir. 1952) ("[T]hat other charities hired professional fund raisers certainly indicates that the idea was not a new one with appellants in view of their long associations with such organizations and their familiarity with generally accepted operational practices in fund raising"); Trial Tr. 195 (Aug. 17, 2017) (Doc. 454), *United States v. Shapiro*, 15-cr-155 (D. Conn.) (admitting chat-room transcripts of non-defendants as evidence of "conduct in the marketplace").

Defendants seek to use evidence of professional norms in the FX industry for the same purpose: to contest the elements of agreement and intent.  The Government mischaracterizes Defendants as arguing their conduct was lawful because "others did it too."[17]  Instead, evidence of industry norms (including the behavior of FX customers) bears directly on whether Defendants had an illegal agreement or acted with the intent to fix prices.[18]

### 1. Evidence of Professional Norms Is Relevant to Prove the Absence of an Illegal Agreement

Mere parallel conduct is not an "agreement" under the Sherman Act.[19]  The Government ignores this basic point of law by moving to exclude Defendants' evidence of professional norms in the FX industry and objecting to Defendants' proposed jury instruction on this issue as follows:

> It would be error to instruct the jurors that a "shared customs or norms" defense exists to a *per se* charge under Section 1 of the Sherman Act. . . .  Defendants' escalator example is contrary to established law.  *An "agreement" for purposes of the Sherman Act need only be a mutual understanding, which the "stand-right, walk-left" escalator convention is* (albeit a legal one).[20]

No law supports the Government's position.  Following escalator conventions requires no

---

[17]  Mem. at 8 (quoting *United States v. Apple, Inc.*, 952 F. Supp. 2d 638, 699 (S.D.N.Y. 2013)).

[18]  Industry practice is also admissible as background evidence that will help the jury evaluate Defendants' conduct in a complex, unfamiliar market.  *See United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988) (background evidence can show "the circumstances surrounding the events" or "furnish an explanation of the understanding or intent with which certain acts were performed"); *United States v. Onumonu*, 967 F.2d 782, 788 (2d Cir. 1992) (trial court improperly excluded expert testimony on "the prevalence of diamond smuggling" that was probative of defendant's intent); *SEC v. U.S. Envtl., Inc.*, No. 95 Civ. 6608 (PKL)(AJP), 2002 WL 31323832, at *2 (S.D.N.Y. Oct. 16, 2002) (courts permit securities experts to help juries in "understanding trading patterns, . . . regulations and complicated terms and concepts inherent in the practice of the securities industry.").

[19]  *See* n.5 *supra*.

[20]  Jt. Proposed Reqs. to Charge, at 99 (Aug. 1, 2018) (Doc. 113) (emphasis added).

"meeting of the minds" or "conscious commitment to a common scheme,"[21] just as following business convention cannot violate the Sherman Act under Supreme Court precedent: "[C]onscious parallelism has not yet read conspiracy out of the Sherman act entirely."[22]

Because the Government lacks evidence of an explicit price-fixing agreement,[23] it must ask the jury to infer an unspoken cartel agreement from Defendants' conduct.  Defendants' evidence of FX industry norms would offer the jury a competing inference:  that their conduct was not based on any agreement, but was based on independently following industry norms, just like standing on the right and walking on the left of an escalator.

The Government's argument to exclude evidence of industry norms would, therefore, improperly deprive Defendants' of an important aspect of their defense and lower the Government's burden to show "the inference of conspiracy is reasonable in light of the competing inferences of independent action."[24]  Because excluding Defendants' industry norms evidence would leave the jury without a narrative to counter the Government's insinuations of conspiracy, the Court should deny the Government's motion.

### 2.    Professional Norms Evidence Is Relevant to Prove Lack of Intent

The Government exhausts multiple pages (Mem. at 11-14) arguing the proper intent standard in *per se* antitrust cases.  But especially in a criminal case involving foreign conduct,

---

[21]  *Am. Tobacco*, 328 U.S. at 810 (requiring "meeting of minds" to prove agreement under 15 U.S.C. § 1); *Monsanto*, 465 U.S. at 764 (holding that "conscious commitment to a common scheme" is required to prove agreement under 15 U.S.C. § 1).

[22]  *Theatre Enters.*, 346 U.S. at 541; *Twombly*, 550 U.S. at 561 n.7 (parallel conduct not an "agreement" under the Sherman Act); Jury Instr. at 20 (Nov. 6, 2017) (Doc. 235), *United States v. Tokai Kogyo Co.*, 16-cr-63 (TSB) (S.D. Ohio) (that defendants had "common interests, or engaged in similar conduct, is not enough to establish a criminal agreement.").

[23]  *See* n.14 *supra*.

[24]  *See Matsushita*, 475 U.S. at 588.

the law is clear:  the Government must prove that Defendants *intended to fix prices*,[25] and

*intended to cause* a substantial anticompetitive effect on U.S. commerce.[26]  The industry norms

evidence is relevant to disprove both types of intent.

Evidence that Defendants' use of multibank chat rooms matched FX industry norms

rebuts the allegation that they knowingly joined an illegal conspiracy with an intent to fix prices.

Defendants intend to call trader witnesses who worked at one of Defendant's banks who will

testify in part that they, like nearly all other traders (and many FX customers), used chat rooms

in the ordinary course to gather market color and to find counterparties to facilitate efficient,

liquidity-sourcing transactions.  That Defendants used an industry-standard tool in an industry-

standard way shows they acted consistent with FX norms, not an intent to fix prices or create

anticompetitive effects, as the Government must prove.[27]  The Court should not permit the

---

[25] *See* n.6 *supra* (quoting *Gypsum*).  The Government errs by contending that arguing a lack of intent to fix prices is tantamount to arguing a lack of willfulness or bad faith.  Mem. at 12-13. Second Circuit precedent requires proof that a criminal defendant *"intentionally"* engaged in conduct that is *per se* illegal.  This in turn requires *knowing* the object of the conspiracy (to fix prices) and joining the conspiracy with the *"intent to effectuate"* that object—*i.e.*, an intent to fix prices.  *Gypsum*, 438 U.S. at 443 n.20; *Koppers*, 652 F.2d at 295 ("[T]he jury was properly instructed that . . . it must find an intent to rig prices.").

[26] *See Hartford Fire*, 509 U.S. at 796.  The Government concedes it must satisfy *Hartford Fire*, Mem. at 13 n.8, yet seeks to preclude Defendants from offering evidence of the lack of "purpose of achieving anticompetitive effects" and of "actual effect" from their conduct.  Mem. at 7, 13. This makes no sense.  *Hartford Fire* requires the Government to prove conduct that was "***meant*** to produce and ***did in fact*** produce some substantial effect in the United States."  *Hartford Fire*, 509 U.S. at 796.  Intent and effects are right there in the standard.

[27] The Government's reliance on *Apple* to exclude "market standards" evidence is inapposite. Mem. at 8 (citing *Apple*, 952 F. Supp. 2d at 699).  The district court's decision in *Apple* does not support exclusion.  There, the court (as factfinder in a bench trial) *did* consider evidence of whether two of Apple's competitors (Amazon and Google) engaged in similar "tactics," but found (as a factual matter) the evidence unpersuasive because Amazon and Google did not share Apple's intent "to eliminate retail price competition or to raise retail prices."  952 F. Supp. 2d at 699.  Thus, *Apple* acknowledges that industry practice evidence can be relevant to intent, and the question is one of fact.  *Apple* is also unlike this case because it was a *civil* case tried on *both* rule of reason and *per se* standards.  *Id.* at 694.  Here, other FX traders' practices will show that the purpose of their *and* Defendants' conduct was to create markets, exchange information, and

Government to try to satisfy its burden by excluding Defendants' evidence of lack of intent.[28]

### B. Defendants Are Entitled to Introduce Evidence of Chat Rooms' Legitimate Purposes

The Government has conveyed its intention to argue that Defendants' chat room communications were improper, secret, intended to facilitate price fixing, and otherwise inherently indicative of conspiracy.[29]  The Government has already played up one of the chat room's purported names (which the chat itself never bore) to invoke Defendants' chats as akin to clandestine "mafia" meetings.  To allow the Government to argue its preferred inferences in a vacuum would be both highly misleading and fundamentally unfair.[30]  Defendants can combat such inferences only by introducing countervailing evidence of the legitimate purposes of their chat room in the two ways discussed below—neither of which mounts a "following-orders" defense, as the Government contends.  Mem. at 9-10.

---

transact—not to fix prices.

Two other unpublished decisions cited by the Government involve defendants charged with mail fraud and securities fraud who argued selective prosecution.  *See United States v. White*, No. 02-Cr.1111 (KTD), 2003 WL 721567 (S.D.N.Y. Feb. 28, 2003); *United States v. Stewart*, No. 03-Cr.717 (MGC) 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004).  Defendants are not arguing selective prosecution; these cases are inapposite.

[28]  *See Brandt*, 196 F.2d at 657 ("[N]o events or actions which bear even remotely on [the] probability [of intent] should be withdrawn from the jury unless the tangential and confusing elements interjected by such evidence clearly outweigh any relevancy it might have."); *United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008) (vacating conviction and explaining that expert testimony about "the realities and motivations of online role-playing via chatrooms and email" would help jury understand the evidence and support defendant's lack-of-intent defense).

[29]  *Indictment* ¶ 23(a); Kendall Decl., Ex. A 46:5-47:16 (soliciting testimony that participants in the chat room used "code names" to hide their conduct); *see also, e.g.*, *id.*, Ex. B  (yellow highlighting added) (Draft working transcription (MG005-000006) of Dec. 20, 2011, recording produced as BARC-FX_00964840) ("if you ever get on [a] chat with those guys . . . they've got all this code"); *id.*, Ex. C (yellow highlighting added) (FBI transcription (FBI011-EDOC-00000022) of Jan. 17, 2013, recording produced as Citi-FX_DOJ_00089289) ("[Y]ou wanna bet? . . . .  Ten thousand dollars, I would find something that'll incriminate you on something. . . . . and tryna use coded stuff").

[30]  *See United States v. Blum*, 62 F.3d 63, 69 (2d Cir. 1995) (exclusion of evidence that "went to the core of the prosecution's case" could not be viewed as harmless).

First, evidence that the banks provided traders with multibank chat rooms—and that Defendants' supervisors encouraged them to use chat rooms to gather market color, exchange information, and transact for the purpose of trading better and more effectively—will explain to the jury why Defendants used interbank chat rooms.[31]  Defendants expect the Government will argue to the jury that it should view Defendants' chat room as evidence of their unlawful price-fixing conspiracy, because "competitors" would have no reason to exchange such information. Defendants need to be able to counter that misleading inference with evidence that their information exchange did have legitimate purposes, and that using chat rooms was an accepted part of an FX trader's job responsibilities.

Second, this same evidence will negate the inference that Defendants acted with an intent to fix prices or participate in a secret conspiracy.  In *Litvak*, the Second Circuit vacated a conviction in part based on the exclusion of evidence of supervisor knowledge and approval, which the court held was relevant to negate the defendants' criminal intent:

> The District Court characterized the proffered evidence as improperly "suggest[ing] that everybody did it and therefore it isn't illegal."  But Litvak's counsel did not proffer the evidence for that purpose . . . .  [T]his evidence would provide "a fair basis upon which to infer that when Mr. Litvak did the very same thing, . . . the supervisors saw and approved of [it] as standard operating procedure."  Such an inference would support Litvak's attempt to introduce a reasonable doubt as to his intent to defraud. . . .[32]

---

[31]  *See Citizens & S. Nat'l Bank*, 422 U.S. at 113-14 (discussing "dissemination of price information"); *Monsanto*, 465 U.S. at 763-64 (discussing necessity of information exchange between parties in vertical relationships); *Cement Mfrs.*, 268 U.S. at 604 (discussing lawfulness of information exchange to safeguard against buyer misconduct); *Sitkin Smelting & Ref. Co. v. FMC Corp.*, 575 F.2d 440, 446 (3d Cir. 1978) (stating that buy/sell transactions among contracting parties are not "price-fixing" under the Sherman Act).

[32]  808 F.3d at 189-190 (citations omitted); *see also United States v. Grose*, 461 F. App'x 786, 794 (10th Cir. 2012) ("If the jury believed [the defendant] was only acting at [his boss's] direction—and he believed it was appropriate to use the company's funds in this manner—then . . . it could not find he had the intent to defraud."); *United States v. Gaspard*, 744 F.2d 438, 440 (5th Cir. 1984) (supervisors' knowledge of defendant's conduct relevant to element of intent).

Here, too, Defendants' supervisors knew and encouraged them and their colleagues to participate in multibank chat rooms.  That evidence gives the jury a basis to infer that Defendants never intended to fix prices but instead were using the chat room for legitimate purposes—namely, gathering market color and transacting.  The evidence also dispels the suggestion that Defendants intended to participate in a secretive conspiracy.[33]  Proof of such legitimate, cooperative behaviors also refutes the Government's claim of a "naked" price-fixing conspiracy.[34]

### C.   Defendants Are Entitled to Introduce Evidence of the Effect of Their Conduct to Negate the Existence of a Price-Fixing Conspiracy and Intended and Substantial Effects in the United States

Evidence that the chat room did not have any negative price "effect" is relevant first, to negate the inference that any price-fixing agreement existed at all, and second, to negate the Government's claim that Defendants intended a "substantial" "effect" on U.S. commerce *and* that their conduct actually did substantially affect U.S. commerce, as required under *Hartford Fire*.  The Government's contrary statement notwithstanding, it has long been the case that lack of effect evidence is admissible in *per se* cases to prove the absence of a price-fixing agreement.[35]  Evidence that the purpose of Defendants' chat room practices was to obtain *better*, rather than *worse*, prices for customers, and that the entire FX industry used chat rooms for such

---

[33]  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) ("conspiracy by its very nature is a secretive operation").

[34] *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 20 (1979) (defendants' licensing arrangement not *per se* unlawful because it was "not a 'naked [restraint] of trade with no purpose except stifling of competition,' but rather accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use") (citation omitted).

[35]  The Supreme Court has said that evidence of "price changes is circumstantial evidence of the existence of a [price-fixing] conspiracy."  *Am. Tobacco*, 328 U.S. at 804.  The converse is equally true. *E.g.*, *Matsushita*, 475 U.S. at 592 ("The alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not in fact exist."); *Cont'l Baking Co. v. United States*, 281 F.2d 137, 141, 145 (6th Cir. 1960) (defendants entitled to introduce "explanatory economic evidence" of "factors affecting price changes" to disprove existence of *per se* price-fixing agreement).

purposes, undercuts any inference of a price-fixing conspiracy or that Defendants' intended or actually created substantial anticompetitive effects in the United States.

### D.    Defendants Are Entitled to Introduce Evidence of Their Vertical Relationship to Show the Absence of a *Per Se* Restraint of Trade

The Government concedes its burden to "prov[e] beyond a reasonable doubt that Defendants entered into a *horizontal* price-fixing conspiracy." Mem. at 15 (emphasis added). Yet the Government invokes only the Court's order on Defendants' motion to dismiss (which examined the Indictment, not any evidence) to try to exclude evidence and argument that the vertical—*i.e.,* non-horizontal—nature of their relationship in the interbank market supports acquittal. The Government cites no case law in support of its argument and mischaracterizes the purpose of Defendants' evidence. Mem. at 15. As Defendants explained in their motion to dismiss,[36] they had an inherently vertical relationship in the interbank market; this evidence will show that the Government has not met its burden to prove a horizontal restraint. Because the parties clearly dispute the facts underlying the nature of Defendants' relationship in the interbank market, Defendants are entitled to have the jury find those facts, and to argue the implications of those facts consistent with the Court's jury charge.[37]

---

[36] The Government wrongly claims Defendants, in their motion to dismiss, "never denied . . . they were horizontal competitors." Mem. at 14. Defendants' contention was that their relationship in the interbank market was inherently vertical (not horizontal), Defs.' Mem. in Supp. of Mot. to Dismiss at 8-11 (Doc. 63), and thus that any restraint among them could not be *per se* unlawful. *See* n.12 *supra*. Neither the Indictment nor the Court's order denying Defendants motion to dismiss binds this Court in assessing what evidence Defendants may use at trial—particularly when it will refute the Government's neologism of "momentary verticality," Mar. 25, 2018, Hr'g Tr. 21:3-5 (statement of Government); *id*. 20:12-16 (same), and instead show that Defendants' relationship was characterized by *constant* verticality.

[37] *See In re Sulfuric Acid*, 743 F. Supp. 2d 827, 868 (N.D. Ill. 2010) (holding on summary judgment that "whether Noranda and Falconbridge stood in a horizontal, vertical, or hybrid relationship with co-Defendants remains a triable issue of fact"); *Galardo v. AMP Inc.*, No. C 79-3079 THE, 1982 WL 1791, at *5 (N.D. Cal. Jan. 8, 1982) (finding no *per se* restraint because the "evidence at trial has revealed that defendants . . . are not horizontal competitors, but instead, two vertically related entities"); *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 425 (8th Cir.

**E.    The Probative Value of the Evidence Is Not Substantially Outweighed by Danger of Misleading the Jury or Wasting Time**

The Government's only remaining argument is pure conjecture—that the trial will get too complicated and take too long if this critical evidence is admitted.  Mem. at 10.  Defendants have the due process right to contest the elements of the offense.  The Government should not be permitted to hamstring the defense due to exaggerated concerns about the "detrimental effect on the length, complexity, and coherence" of trial.  *Id*.  Rather than confuse or mislead the jury, the evidence the Government wishes to exclude will provide the crucial context in which Defendants acted, offering a competing narrative for the jury on the ultimate issues it must decide.  The Government should not be permitted to try its case in a vacuum.

Admitting Defendants' evidence would not entitle the Government, moreover, to offer highly prejudicial "rebuttal" evidence about bank pleas, trader terminations, and other alleged improper behavior, which the Government threatens to do.  Mem. at 10-11.  The Government's purported "rebuttal" evidence would not actually "rebut" evidence that Defendants' behavior was parallel conduct based on industry norms, or that the chat rooms were used by traders and encouraged by superiors for the purpose of exchanging market color and transacting with other market participants.  Likewise, the fact that some market participants were *later* sanctioned for conduct in chat rooms does not in any way "rebut" the inference that there was nothing inherently conspiratorial about Defendants' chat room use.  Defendants have already objected to the introduction of the banks' guilty pleas as inadmissible under any scenario under Rule 403

---

2009) (defendants' evidence showed that the "motivations and actions are all vertical" and plaintiffs' evidence "does nothing to suggest otherwise"); *see also Leegin Creative Leather Prods.*, 551 U.S. at 907; *Gatt Commcn's, Inc. v. PMC Assocs., LLC*, No. 10 Cv. 8, 2011 U.S. Dist. LEXIS 29072, at *8 (S.D.N.Y. Mar. 10, 2011) (stating that mixed "horizontal and vertical" agreements are not *per se* illegal).

and the Confrontation Clause.[38]  Defendants will object at trial if the Government seeks to introduce irrelevant, unfairly prejudicial evidence of the termination or punishment of other banks or traders.

**OPPOSITION TO THIRD MOTION TO
EXCLUDE EXPERT TESTIMONY OF PROFESSOR EDWARD SNYDER**

The Court should deny the Government's motion to exclude testimony from Professor Edward Snyder.  He is the William S. Beinecke Professor of Economics and Management in the Yale Economics Department, earned his Ph.D. from the University of Chicago, was a staff economist with the DOJ Antitrust Division, and has taught economics for nearly 30 years at leading national universities.  The Government disputes neither Professor Snyder's expertise in industrial organization, antitrust economics, and cartel theory, nor his experience providing expert testimony (often about effects) in antitrust cases.[39]  Nor does the Government dispute that the issues he will address are relevant.[40]  His testimony concerning the nature of the FX market and whether Defendants' alleged conduct exhibited the indicia of cartel behavior will help the jury evaluate whether Defendants had an agreement to fix prices, and whether any such agreement had "substantial and intended effects" on U.S. commerce under *Hartford Fire*.

It is standard in antitrust cases for parties to present evidence through industrial economists because an economic perspective is a helpful, valuable lens that a jury can use to infer whether a price-fixing agreement exists.[41]  Such economic testimony is particularly helpful

---

[38]  Defs.' MIL Mem. at 1-7.

[39]  Syme Decl. Ex. 1, ¶¶ 1-13 (Doc. 119-1) (Defs.' Suppl. Disclosure of Edward A. Snyder Expert Test. ¶¶ 1-13 (Aug. 3, 2018)); *id.* (attaching Snyder CV)).

[40]  *Id.* ¶¶ 14-25.

[41]  *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) (Posner, J.) ("The evidence upon which a plaintiff will rely will usually be and in this case is of two types—*economic evidence* suggesting that the defendants were not in fact competing, and noneconomic evidence suggesting that they were not competing because they had agreed not to

in cases such as this one, where the Government seeks to prove the existence of a price-fixing agreement through conduct.  Specialists in industrial organization with economics training, such as Professor Snyder, are particularly well qualified to testify about these issues.[42]

Professor Snyder's proposed testimony falls precisely within his areas of expertise.  He will testify about background economic principles and cartel theory as applied to the FX spot market, the economic indicia of cartel behavior and whether Defendants' conduct exhibit these indicia, and the likelihood of effects (if any) from the conduct.[43]  Professor Snyder is eminently qualified to offer this type of testimony.  Experts often opine on "effects" even in *per se* cases as indirect evidence of whether there was an agreement to fix prices in the first place.[44]  And having charged a foreign conspiracy, the Government concedes it must prove that the conspiracy had "substantial and *intended* effects within the United States."  Mem. at 13 n.8.  This adds another layer of relevance to Professor Snyder's testimony.

Nevertheless, the Government seeks to exclude the testimony of Professor Snyder on four grounds: (1) that he lacks "FX market" experience; (2) that "his 'perspective of cartel theory and industrial organization economics'" lacks any reliable methodology; and that his testimony would (3) usurp the roles of the Court and the jury and (4) mislead the jury.  These arguments are meritless.  First, Professor Snyder's qualifications to opine on economic principles, cartel theory, the economic indicia of cartel behavior and the type of effects (if any) an economist would expect to see from the alleged conduct are commensurate with those of experts permitted to

---

compete.") (emphasis added).

[42] *See U.S. Info. Sys. v. IBEW Local Union No. 3*, 313 F. Supp. 2d 213, 229, 236-37, 240 (S.D.N.Y. 2004), *aff'd*, No. 00-cv-4736 (S.D.N.Y. Apr. 6, 2004) (Berman, J.).

[43] Syme Decl. Ex. 1, ¶¶ 14-25 (Doc. 119-1).

[44] *See Cont'l Baking Co. v. United States*, 281 F.2d 137, 141, 145 (6th Cir. 1960) ("explanatory economic evidence" of "factors affecting price changes" admitted to disprove *per se* price-fixing agreement).

testify in other price-fixing cases, and the Government cites no authority for its contrived requirement of industry-specific experience.  Second, Professor Snyder's methodology, rooted in his experience, expertise, and the evidence in this case, is comparable to those of antitrust economists deemed reliable by numerous courts.  Third, Professor Snyder will testify to factual issues deemed by the Second Circuit not to usurp the roles of the court and jury.  Finally, Professor Snyder's testimony will help the jury make sense of the complex market forces in an unfamiliar industry—not mislead it.  Accordingly, the Government's motion should be denied.

### A.    Professor Snyder is Eminently Qualified to Opine on the Proposed Subjects of His Testimony

The Government contrives an unprecedented standard for the permissible scope of expert economic testimony by arguing that Professor Snyder is "not an expert *in the FX market*," and so is "not qualified to opine on *that market*."  Mem. at 17 (emphases added).  No authority requires industry-specific expertise, and the Government cites none.[45]  Courts routinely allow economists to testify about markets in which they lack substantive industry expertise.[46]

The Government's argument about "*overcharge* and *damages*" misrepresents Professor Snyder's experience giving expert testimony and misunderstands the import of testimony concerning overcharges.  In the *TFT-LCD* price-fixing case, the court permitted Professor Snyder to testify about "economically relevant considerations that should be taken into account when

---

[45]  The Government's argument that industry expertise is necessary to opine on the FX market is inconsistent with its decision to offer Mr. Jeremy Tilsner as an expert witness to discuss, among other things, market shares and trade attributes, despite lacking any substantive experience with FX markets.  Regardless, Mr. Tilsner is unqualified to offer opinions that demand expertise in industrial organization and antitrust cases.  *See* Defs.' MIL Mem. at 16-23.

[46]  *See, e.g.*, *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 151-52 (N.D.N.Y. 2010) (permitting expert economist lacking hospital administration expertise to testify that defendant hospitals' conduct "made it easier . . . to form and maintain a wage agreement"); *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1355 (N.D. Ga. 2000) (permitting expert industrial economist lacking polypropylene carpet market experience to testify that market's "climate . . . was consistent with . . . a conspiracy to fix prices").

16

performing an overcharges analysis," namely the "circumstances relevant to the ability of the accused conspirators in this case to effectively fix prices."[47]  Those circumstances included discussions of the market structure (such as entry and exit of firms), market shares, role of product distribution differentiation, and the impact of vertically integrated firms on the market. This testimony is directly relevant to whether there were intended substantial *effects* in the United States[48]—a requirement the Government concedes it must prove.  Mem. at 13 n.8.

Finally, the Government selectively compares the expected testimony of Professor Snyder and a second defense expert, Dr. Michael Melvin, to contend the Court should exclude Professor Snyder's testimony as duplicative.  Mem. 18-19.  Contrary to the Government's assertions, only Professor Melvin will testify as an expert about Defendants' and others' chatroom communications, the nature of specific FX industry practices and norms (including those of FX customers), market-makers' job responsibilities, and the types of FX market participants. Professor Snyder will rely in part upon Professor Melvin's opinions (and evidence from the Government's witnesses) as a basis for his opinions, but only Professor Snyder will apply economic principles to discuss the economic significance of those facts.[49]  Rather than duplicating each other's testimony, Professor Snyder's and Professor Melvin's opinions will complement each other.

---

[47]  Defs.' Opp'n at 3-4 (Dec. 7, 2012) (Doc. 7312), *In re TFT-LCD (Flat Panel) Antitrust Litig.*, Doc. No. 7312, 3:07-md-01827-SI, Individual Case No. 3:10-cv-1064-SI (N.D. Cal.); Order Denying Motion to Exclude (Jan. 8, 2013) (Doc. 460).  In the criminal TFT-LCD price-fixing trial before the same judge, the DOJ Antitrust Division (the Government here) sponsored the testimony of industrial economist Dr. Keith Leffler, who similarly had no special expertise in the TFT-LCD industry.  Because the conduct in that case occurred abroad, the Government in the AU Optronics trial was similarly required to show intended and substantial effects in the United States, and used the testimony of economist Dr. Leffler as support.

[48]  *Hartford Fire*, 509 U.S. at 764.

[49]  *E.g.*, Syme Decl. Ex. 1, ¶¶ 22, 25 (Doc. 119-1).

**B.      Professor Snyder Based His Opinions on Widely Accepted, Reliable Methodologies**

The Government next asserts that the application of "economic principles" and cartel theory to the facts of this case is not a "discernible, reliable methodology to apply to the evidence in this case." Mem. at 19. Again, the Government's argument is contrary to well-established precedent finding economists' application of economic theories and methods to be reliable methodologies, particularly in antitrust cases.[50]

The Government's reliance on *In re LIBOR* is misplaced.[51] There, the court rejected an expert's mathematical mechanism for identifying "anomalous submissions" that had no basis in scholarship or law, and that empirically appeared to have a high rate of error, as unreliable.[52] Unsurprisingly, the court then rejected the expert's subsequent review of trader communications involving the "anomalous submissions" that his rejected methodology identified, commenting that the next step was "unreliable because it amounts to no methodology at all."[53] By contrast,

---

[50] *See Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 505 (S.D.N.Y. 2015) ("[The expert's] reasoning is based principally upon [her] experience and research in the world of [economics], which qualify [her] to opine on such matters. . . .  [S]pecialized knowledge may be relevant and reliable, and therefore admissible . . ., even if the field of knowledge . . . does not readily lend itself to a formal or quantitative methodology.") (internal quotation marks omitted); *U.S. Info. Sys.*, 313 F. Supp. 2d at 229, 236-37, 240 (antitrust economist applied reliable methodologies where testimony "includes the inferences an economist would draw from the facts in the record concerning the nature of the market," particularly because "[t]here is no single, established methodology for determining whether the relevant market reflects evidence of anticompetitive behavior"); *Ramirez v. Berkel, Inc.*, No. 02-cv-6887 (JSR)(KNF), 2005 U.S. Dist. LEXIS 14324, *16 (S.D.N.Y. July 14, 2005) ("Drawing upon one's educational background and practical experience is a reliable methodology through which to develop opinions and reach conclusions about scientific, technical or other areas of specialized knowledge."); *In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318, 2013 U.S. Dist. LEXIS 62394, at *41 (D. Md. May 1, 2013) (admitting expert testimony) ("An expert's analysis of plus factors focusing on market conditions and firm behavior finds its roots in the extensive antitrust literature.").

[51] 299 F. Supp. 3d 430 (S.D.N.Y. 2018) (cited in Mem. at 19-20).

[52] *Id.* at 499-502.

[53] *Id.* at 502.

Professor Snyder will apply his expertise to evidence the *Government* will present at trial, and will address whether *that evidence* bears the economic indicia of cartel behavior.

*SEC v. Tourre* is also inapposite.[54]  *Tourre* addressed the admissibility of expert testimony concerning the "materiality" of certain undisclosed information to a reasonable CDO investor, where the expert had no experience with CDOs.  In that context, the court reasoned that the expert's "opinion" that the information was *not* material based on "economic logic" was "inadmissible ipse dixit."[55]  Here, in contrast, the central question is not whether a reasonable person in a certain industry might find certain information material, but whether a cartel existed. As courts have routinely found, this is an area where "economic logic" is very helpful, particularly where evidence of agreement is suggestive rather than conclusive, and prior industry expertise is unnecessary.[56]

Finally, George Stigler's two-page "article," which is not the law, does not support the Government's attempt to exclude Professor Snyder.  Mem. at 20.  Professor Snyder will not simply "read documents" and then opine on whether they show "collusion."[57]  Rather, based on the *behavior* at issue (as presented during the trial), he will offer expert opinion and testimony rooted in basic economic principles and methods—*e.g.*, the interaction of supply and demand curves in the FX market, whether the structure of the FX market was conducive to price-fixing, Defendants' market shares, whether there was a substantial effect on the United States (*Hartford Fire*), the extent to which Defendants' conduct could affect the U.S. market, and whether Defendants' conduct was consistent with economic indicia of price-fixing.

---

[54]  950 F. Supp. 2d 666, 678 (S.D.N.Y. 2013) (cited in Mem. at 20).

[55]  *Id.* at 678.

[56]  *See In re High Fructose*, 295 F.3d at 655.

[57]  *See* Section A *supra*; Syme Decl. Ex. 1, ¶ 25 (Doc. 119-1); *id.* ¶¶ 14-24 (describing Prof. Snyder's methods and conclusions).

**C.      Professor Snyder's Testimony Will Not Usurp the Roles of the Court or Jury**

The Government also seeks to preclude Professor Snyder from explaining to the jury facts about the economic indicia of a price-fixing agreement, and whether the conduct that the Government will present at trial is consistent with such indicia, on the basis that such testimony purportedly usurps the role of the Court and the jury.  Mem. at 21-22.  The Government concedes that such facts are appropriate components of a permissible defense, but ignores that Defendants are also entitled to offer *opinions* on these facts, provided they are helpful, reliable, and the expert is qualified to offer them.  Mem. at 21 ("Defendants are free to make relevant *factual* arguments negating a price-fixing conspiracy in this case.").

The Government improperly conflates the legal definition of price-fixing (on which only this Court may instruct the jury) with probative, predicate facts necessary to inform the jury's deliberations (about which Professor Snyder will opine)—namely, the economic conditions and conduct that tend to suggest that a price-fixing agreement or cartel existed.  Professor Snyder will not testify that the Defendants did not fix prices, nor opine about what the law forbids or what legally constitutes a price-fixing agreement.  Instead, he will explain what factual patterns (*i.e.*, economic indicia) one tends to see when there is a price-fixing agreement, whether those factual patterns are present here, and whether the requisite substantial effects could occur.[58]  Courts have rejected the very arguments the Government makes here.[59]

---

[58]  Syme Decl. Ex. 1, ¶¶ 15, 19-22 (Doc. 119-1).

[59]  *In re Titanium Dioxide Antitrust Litig.*, 2013 U.S. Dist. LEXIS 62394, at *14-15 ("[T]estimony is admissible under Rule 704(a), because it does not state a legal standard or draw[] a legal conclusion.  Nor does it use terms with distinct and specialized meaning in the law.") (citation and quotation marks omitted); *U.S. Info. Sys.*, 313 F. Supp. 2d at 229, 236-37, 240 (antitrust economist permitted to "explain whether conduct is indicative of collusion" and whether the "'climate' of a specific market was"—or, as here, was not—"consistent with a conspiracy," so long as he did not opine whether the contested conduct was or was not "anticompetitive").

The Government's argument that Professor Snyder's proposed testimony would usurp the jury's role also fails.  Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue," and the Second Circuit has said that an expert may opine on "an issue of fact within the jury's province"[60]—like the factual question of whether Defendants' conduct produced substantial effects in the United States—so long as she does not "tell the jury what result to reach."[61]  Professor Snyder will not tell the jury what result to reach about any of the issues, nor will he testify about Defendants' "mental state" as prohibited by Rule 704(b).  Professor Snyder will testify only as precedent allows.[62]

### D.      Professor Snyder's Testimony Will Not Mislead the Jury

The Government recycles its unsupported arguments that Professor Snyder's testimony would usurp the jury's role by contending that the same testimony would mislead the jury. Mem. at 22.  The Government fails to explain what is misleading about Professor Snyder's testimony.  As stated above, Professor Snyder will not be offering legal arguments or conclusions to the jury.  Indeed, excluding an expert whose testimony would be directly relevant to the core issues in this case would be fundamentally unfair and reversible error.[63]

### OPPOSITION TO FOURTH MOTION
### TO EXCLUDE THE MARCH 15, 2016 SFO LETTERS

Defendants grew up in Britain, worked in London, learned the ways of the FX business

---

[60]  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

[61]  Fed. R. Evid. 704 advisory cmte. note; *Hygh v. Jacobs*, 961 F.2d 359, 363-64 (2d Cir. 1992).

[62]  Moreover, as the Second Circuit recently held, an objection premised on "ultimate issue" grounds is not a basis on which to exclude an expert altogether.  *Litvak*, 808 F.3d at 182 (discussing that Government's "ultimate issue" objection, even if meritorious, would apply "only [to] the underlined portion of the excerpted proposed opinion testimony" and thus could not have justified full exclusion).

[63]  *See Litvak*, 808 F.3d at 182-84 (vacating conviction where court excluded expert testimony "highly probative of materiality, the central issue in the case" and "hotly contested at trial," especially due to the complexity of the market at issue).

from UK colleagues, and communicated in a uniquely British vernacular.  The UK's Serious Fraud Office (SFO) conducted an exhaustive investigation into their conduct—involving the work of 27 barristers, over £2 million, and the review of over a half million documents.  The SFO concluded that the evidence, "even if proven and taken at its highest, would not meet the evidential test required to mount a prosecution," and that "this evidential position could not be remedied by continuing the investigation."  The SFO memorialized its conclusions in declination letters to Defendants Usher and Ramchandani.[64]

Prosecutors in the country where Defendants lived, worked, and executed trades thus discerned no illegal agreement from their conduct.  Yet Defendants are charged in the United States with intentionally affecting U.S. commerce under an unspoken agreement to eliminate competition and fix prices.  Issues relating to the UK's regulation and investigation are inextricably interwoven with at least three different categories of evidence at trial: (1) Defendants' consciousness of innocence; (2) Witness A's credibility; and (3) Defendants' lack of intent to fix prices.

First, the SFO's declination letters are key to Defendants' ability to present "evidence of [their] innocent state[s] of mind," which can be, and is here, "critical to a fair adjudication of criminal charges."[65]  Defendants' decisions to appear for trial voluntarily, rather than contest

---

[64]  Syme Decl., Ex. 5 (Doc. 119-5).  The Government is incorrect that the SFO investigated fraud only.  The SFO also examined "cartel offenses," the UK's version of price fixing.  *See, e.g.*, Kendall Decl., Ex. E (additional communication from SFO to Usher).

[65]  *United States v. Biaggi*, 909 F.2d 662, 692 (2d Cir. 1990) (reversing conviction where trial court excluded consciousness of innocence evidence).  The SFO's declination letters make Defendants' consciousness-of-innocence defense more compelling than that offered in *United States v. Connolly*, where the Court concluded that "[the defendant] would almost certainly have been extradited had he contested extradition."  No. 16-cr-370, 2018 U.S. Dist. LEXIS 84167, at *37 (S.D.N.Y. May 15, 2018).  Here, the Government concedes that "it was not a foregone conclusion that Defendants would have been extradited."  Jt. Proposed Reqs. to Charge at 112 (Doc. 114).

extradition, is probative of their respective beliefs in their own innocence.[66]  But the power of Defendants' decisions to appear lies in the fact that—because of the SFO's declinations—they held a reasonable expectation that they could defeat extradition.[67]  Exclusion of the SFO letters would thus deprive Defendants of an important line of defense.

Second, Witness A gave statements to multiple international jurisdictions relating to the conduct in this case.  Witness A also consented to an interview with the SFO in December 2014, where, unlike with other agencies, he apparently "provided no comment to the questions except his name, address, and citizenship."[68]  Witness A's prior statements to domestic and international regulators will be an important focus of his cross-examination.  This line of questioning necessarily includes inquiries into (1) his motivations in cooperating with certain agencies, but not others—such as his own domestic prosecutor (the SFO), where the locus of the alleged conduct is centered; and (2) the outcomes of these investigations and how they informed his decision to cooperate.[69]  Where the credibility of the Government's only percipient fact witness will be hotly contested, the ability to question him about these statements, his decisions to cooperate, and the outcome of these proceedings is vital.  Moreover, because the jury may presume (incorrectly) that, as in the United States, Witness A avoided prosecution only by cooperating against Defendants, the SFO declination letters would be essential to prevent that

---

[66]  *United States v. Rajaratnam*, No. 13-Cr-00211, slip op. (S.D.N.Y June 6, 2014) (denying Government's motion to exclude similar evidence).

[67]  *See Scott v. Gov't of the United States of America*, [2018] EWHC 2021 (Admin.) (reversing decision to extradite FX trader from the UK to the United States).

[68]  June 25, 2018, Hr'g Tr. 6:7-11.

[69]  *See SEC v. Goldstone*, No. 12-cv-257, 2016 WL 3854689, at *21 (D.N.M. June 3, 2016) (status of regulator PCAOB investigation into government's cooperating witness was admissible because relevant to evaluating her credibility).

presumption.[70]

Third, the SFO letters are entwined with important evidence of Defendants' lack of intent to fix prices. During the charged conspiracy, Defendants discussed in their chat room how the UK quasi-regulator, the Bank of England, was addressing the issue of inter-bank communications regarding fix positions. For example, following an April 2012 Bank of England meeting attended by Defendant Ramchandani, he conveyed to the other Defendants and Witness A that there was no consensus regarding inter-bank fix communications: "basically[,] it was left as each bank chooses their own policy[;] no central rule[;] . . . unanimous was [the permissibility of] minimizing impact by offsetting flows . . . ."[71] Defendants' chat-room discussions about these meetings reflected their belief that their conduct was designed to achieve legitimate goals acceptable to the Bank of England. The SFO letters corroborate that belief, and negate the Government's view that the purpose of Defendants' conduct was to fix prices.[72]

The Government's objection to the SFO letters on hearsay grounds is misplaced for at least two reasons. First, the SFO letters are not being offered for the truth of the statements made within the letters—that there was "insufficient evidence for a realistic prospect of conviction" or that "the alleged conduct, even if proven and taken at its highest, would not meet the evidential test required to mount a prosecution." Rather, they are being offered for the more limited, non-

---

[70] The Court could also provide a limiting instruction about the narrow purpose for which the SFO letters are being admitted, and that the UK's decision not to prosecute has no bearing on the US's charging decisions. Indeed, the SFO letter, on its own terms, makes that plain.

[71] Kendall Decl., Ex. D at 11:43:10-11:52:43 (yellow highlighting added in Ex. copy) (excerpt of Defs.' chat (Apr. 30, 2012) (BARC-FX_00011614)); *see also Gypsum*, 438 U.S. at 441 (describing illegal conduct under the Sherman Act as often "difficult [for business persons] to distinguish from the gray zone of socially acceptable and economically justifiable business conduct").

[72] *See United States v. Certified Envtl. Servs., Inc*., 753 F.3d 72, 88-90 (2014) (vacating convictions for excluding evidence regarding "the nature of an ongoing regulatory requirement" that was relevant to intent).

24

hearsay purposes of showing that the SFO issued these statements, which supports Defendants' consciousness of innocence, relate to Witness A's bias and credibility, and corroborate Defendants' lack of price-fixing intent.[73]

Second, each SFO letter is a "statement of a public office," and as such is admissible under Federal Rule of Evidence 803(8) if "it sets out . . . factual findings from a legally authorized investigation . . . and the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness."  The Supreme Court has made clear that courts should broadly construe admissibility under this rule "[a]s long as the conclusion is based on a factual investigation."[74]  The SFO letters fall squarely within this provision because they reflect factual findings and conclusions of an authorized investigation with strong indicia of trustworthiness.[75]

---

[73] *See United States v. Reed*, 639 F.2d 896, 907 (2d Cir. 1981) (letter from a bank was admissible in connection with the defendant's "mental state," not for the truth of the letter's contents); *United States v. Godfrey*, 787 F.3d 72, 77 (1st Cir. 2015) (same).

[74] *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988); *see also United States v. Awad*, No. 06 Cr. 600 (DLC) 2007 WL 1988382, at *9 (S.D.N.Y. 2007) (Rule 803(8) includes "factually based conclusions or opinions") (citations omitted).

[75] At a minimum, the Court could take judicial notice under Federal Rule of Evidence 201(b)(2) that the SFO investigated Defendants for the conduct at issue here and declined to prosecute them.  The SFO's declination "is not subject to reasonable dispute" because it both "is generally known within the trial court's jurisdiction" and "can be accurately and readily determined by from sources whose accuracy cannot reasonably be questioned."  *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (explaining that "courts routinely take judicial notice of documents filed in other courts").  Indeed, the SFO announced its decision in a press release in terms identical to those used in the letters.  *See* SFO Press Release (March 15, 2016), available at https://www.sfo.gov.uk/2016/03/15/sfo-closes-forex-investigation.

Date: August 13, 2018

Respectfully submitted

By: /s/ Michael Kendall

Heather S. Tewksbury (pro hac vice)
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 858-6143
Email: heather.tewksbury@wilmerhale.com

Anjan Sahni
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 937-7418
Email: anjan.sahni@wilmerhale.com

*Attorneys for Defendant Rohan Ramchandani*

Michael Kendall (pro hac vice)
WHITE & CASE LLP
75 State Street
Boston, MA 02109
Telephone: (617) 979-9310
Email: michael.kendall@whitecase.com

J. Mark Gidley (pro hac vice)
WHITE & CASE LLP
701 Thirteenth Street, N.W.
Washington, DC 20005
Telephone: (202) 626-3609
Email: mgidley@whitecase.com

Andrew E. Tomback
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 819-8428
andrew.tomback@whitecase.com

*Attorneys for Defendant Richard Usher*

David Schertler (pro hac vice)
Lisa Manning (pro hac vice)
SCHERTLER & ONORATO, LLP
901 New York Ave., N.W.
Suite 500
Washington, D.C.  20001
Telephone: (202) 628-4155
Email: dschertler@schertlerlaw.com
Email: lmanning@schertlerlaw.com

*Attorneys for Defendant Christopher Ashton*